GALVESTON, H. & S. A. RY. CO. v. HAR-
RIS. (No. 5373.)†

(Court of Civil Appeals of Texas. San Antonio.
Jan. 13, 1915. Rehearing Denied
Feb. 10, 1915.)

1. MASTER AND SERVANT (§ 106*)—INJURIES
TO SERVANT—RAILROADS—DEFECTIVE HAND-
HOLD—INSTRUCTIONS.

In an action for injuries to a railroad con-
ductor by the pulling out of a handhold, due to
the absence of the nut on the upper bolt, a re-
quest to charge that the jury might find for de-
fendant, though the nut had been gone for a
long time, and its absence could have been dis-
covered by ordinary care, if the default of the
owner of the car, which was a foreign one, was
the cause of the nut coming off, was properly
refused, since ordinary care required proper in-
spection of all cars handled by defendant, re-
gardless of ownership.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 193–198; Dec. Dig. §
106.*]

2. TRIAL (§ 260*)—INSTRUCTIONS—REQUEST TO
CHARGE.

Where defendant requested several special
charges covering the same issue, and the court
selected and gave one of them, defendant could
not complain of the refusal to give others
which were more specific than the one given.

[Ed. Note.—For other cases, see Trial, Cent.
Dig. §§ 651–659; Dec. Dig. § 260.*]

3. MASTER AND SERVANT (§ 89*)—INJURIES TO
SERVANT — RAILROAD CONDUCTOR — BOARD-
ING TRAIN.

Where a conductor, injured by the pulling
out of a defective handhold as he attempted to
board a train, was entitled to board any part
of the train, it was immaterial that he attempt-
ed to board the car, from which he fell, to dis-
cover whether unauthorized persons were rid-
ing in an emigrant car.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 153–156; Dec. Dig. §
89.*]

4. EVIDENCE (§ 547*)—EXPERTS—PROBABILI-
TIES.

Where plaintiff suffered a mastoid operation
after his injury, a physician, having testified
as an expert, was properly permitted to testify
that the injury "could" have caused a condition
necessitating such operation; such evidence
not being objectionable as merely speculative
and entering the domain of possibilities, as dis-
tinguished from reasonable probabilities.

[Ed. Note.—For other cases, see Evidence,
Cent. Dig. § 2364; Dec. Dig. § 547.*]

5. EVIDENCE (§ 493*)—PHYSICAL CONDITION—
COMMON KNOWLEDGE.

Where plaintiff before his injury was a
strong, healthy man, and he sustained serious
injury, by which his foot was mangled, causing
him to be dazed and shocked and to suffer in-
tense pain, and, after mortification had set in,
his limb was amputated, from which time he
declined in health and became a nerve-wrecked
invalid, it was within the common knowledge
of a layman that such condition could readily
produce a variety of troubles, such as urinary
trouble, eye troubles, or even mastoid inflamma-
tion; and hence a charge that such troubles
could not be considered by the jury for lack of
evidence that they were due to the original in-
jury was properly refused.

[Ed. Note.—For other cases, see Evidence,
Cent. Dig. §§ 2275–2282; Dec. Dig. § 493.*]

6. APPEAL AND ERROR (§ 742*)—EXCEPTIONS—
NECESSITY.

An assignment complaining of error in a
paragraph of the court's charge will not be re-
viewed, where the statement does not show that
it was excepted to before the charge was read to
the jury.

[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

7. DAMAGES (§ 210*) — INSTRUCTIONS — CON-
STRUCTION—"IF PAID NOW."

Where the court's charge, in a personal
injury action on the subject of damages, lim-
ited the recovery to such sum as would com-
pensate plaintiff for his damages "if paid now,"
it could only be interpreted as meaning if paid
now in cash, and was not objectionable for
failure to so state in terms.

[Ed. Note.—For other cases, see Damages,
Cent. Dig. §§ 537, 538; Dec. Dig. § 210.*]

8. TRIAL (§ 145*) — INSTRUCTIONS — ISSUES —
EVIDENCE.

It was not error to refuse to withdraw from
the jury an issue on which there was no evi-
dence.

[Ed. Note.—For other cases, see Trial, Cent.
Dig. §§ 328, 341; Dec. Dig. § 145.*]

9. DAMAGES (§ 132*) — EXCESSIVENESS — PER-
SONAL INJURIES.

Where plaintiff's injuries, other than the
loss of a foot, were not permanent, though se-
rious, a verdict allowing him $25,000 was ex-
cessive to the extent of $5,000.

[Ed. Note.—For other cases, see Damages,
Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

Appeal from District Court, Bexar Coun-
ty; R. B. Minor, Judge.

Action by George E. Harris against the
Galveston, Harrisburg & San Antonio Rail-
way Company. Judgment for plaintiff, and
defendant appeals. Affirmed on condition.

Baker, Botts, Parker & Garwood, of Hous-
ton, and Templeton, Brooks, Napier & Ogden
and Ed W. Smith, all of San Antonio, for
appellant. Perry J. Lewis, Randolph L.
Carter, and H. C. Carter, all of San Antonio,
for appellee.

CARL, J. Appellee, George E. Harris,
sued the Galveston, Harrisburg & San An-
tonio Railway Company, appellant, for per-
sonal injuries sustained about February 5,
1913, by reason of a handhold coming loose
or breaking, whereby appellee was precipi-
tated to the ground and one of his feet and
the ankle crushed to such an extent that
it became necessary to amputate the limb
below the knee. The accident occurred at
Uvalde.

The petition charges:

"That in said freight train there was being
used by the defendant a certain oil tank car,
and on the side of said car, and some two or
three feet from the end thereof, was an up-
right piece, and on said upright piece there
was a grabiron or handhold fixed perpendicu-
larly upon said upright piece for the purpose
of being used by defendant's employés in the
operation of said car and the train; that said
grabiron or handhold was defectively and inse-
curely fastened and in such a condition as to
make it dangerous to be used for the purpose
for which it was intended; that plaintiff, in

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Writ of error pending in Supreme Court.

the discharge of his duty, sought to get upon said car, and, in order to get upon said car, he took hold of said grabiron or handhold, and, while using said grabiron or handhold for the purpose for which it was intended, the same gave way, and the plaintiff was thrown under the moving cars and injured, as hereinafter stated."

It is pleaded further: That it was unlawful for the defendant to use in its train a car which was not provided with sufficient and secure handholds or grabirons; and, notwithstanding this, the defendant negligently permitted the use of the car which had unsafe, insecure, and defective handholds or grabirons, which negligence is alleged to have directly caused and contributed to the plaintiff's injury. That the defendant failed to make proper inspection of said handholds or grabirons by competent inspectors, and that, if proper care had been exercised in the matter of inspection, such defect would have been discovered in the handhold or grabirons, and his injury avoided. That the injury happened at night, and appellee did not know of the defective condition of said handhold or grabiron, and he was without fault. In addition to the loss of the limb, he received a severe shock from the fall and internal injuries to his heart and head. That his nervous system received a shock, and that his kidneys and bladder have become affected to such an extent as to make it difficult to retain his urine in a normal way, and that his back was injured, from which he suffers severe pain, also that his right eye is affected and the sight impaired.

Appellant admitted the accident was caused from the handhold or grabiron giving way, but denied that the appellee was in the discharge of his duty when injured, pleaded that the car upon which he was injured was a foreign car, and appellant had made a proper inspection thereof, and was therefore not liable, since such inspection did not disclose the defect, admits "that shortly after the accident happened, and while the train was still at Uvalde, it was found that said handhold or grabiron was disconnected at the upper end, and that the nut from the upper bolt was gone, and that the bolt to which the upper end of said handhold or grabiron had been attached was not bradded, and that the threads of the said bolt (that remained in the car) were rusty," and pleads that the car, which was east bound, had been inspected at Sanderson and Del Rio by competent inspectors and no defect discovered. It is claimed that the defect was latent, and, since the same was not discovered by a proper inspection, appellant was not liable. It is admitted that the injury to the leg is a permanent one, but that the others are is denied, as well as the fact that the other injuries alleged were caused by the fall. And contributory negligence is pleaded.

The verdict of the jury was for $25,000, and this is claimed to be excessive.

The first three assignments deal with the refusal of the court to give requested charges touching the duty of inspection, etc. The first of those charges is:

"The undisputed evidence shows that the car in question was not a car of the Galveston, Harrisburg & San Antonio Railway Company, but was a car of the Texas & New Orleans Railroad Company. You are therefore instructed that the defendant company cannot be held responsible or liable for any defect there may have been in the construction of the handhold in question, or in the material of which the same was constructed, or in the manner of the application of the handhold to the car, unless you find from the evidence that the defect therein (if any) was such that same could and would have been discovered and remedied by defendant by proper inspection thereof made after the car came into its line, and before the accident happened; and if you find that there was such a defect of construction, or of material, or of application, and that same was the cause of the alleged accident, and that same would not have been discovered and remedied by defendant by proper inspection made of the handhold after the car came onto its line, and before the accident happened to plaintiff, then plaintiff is not entitled to recover, and you should return a verdict for the defendant."

[1] It will be noticed that this charge speaks of defects of construction or of material, while the evidence shows that the nut was off the top bolt which came out. This was the defect complained of in the plaintiff's pleadings, and this was admitted in the answer. This charge would have authorized the jury to find for appellant, even though the nut may have been gone for a long time, and its absence could have been discovered by the exercise of ordinary care, if the default of the owner of the car was the cause of the nut coming off. The charge assumes that this was a foreign car, but that may be set aside. Ordinary care in inspection is required of all cars, regardless of their ownership. Railway v. Kernan, 78 Tex. 297, 14 S. W. 668, 9 L. R. A. 703, 22 Am. St. Rep. 52; Railway v. White, 76 Tex. 103, 13 S. W. 65, 18 Am. St. Rep. 33; Railway v. Harris, 45 Tex. Civ. App. 542, 101 S. W. 506. In the last-named case, the court says:

"It was the duty of the defendant, as stated in the paragraph of the charge complained of, to use ordinary care to furnish a reasonably safe handhold for plaintiff's use in the performance of his duties, as brakeman, and plaintiff had the right to presume defendant had performed its duty in this respect. It was also the duty of the defendant to make inspection of cars furnished by it to its employés for transportation. As to its responsibility for defects in cars of another company drawn over its road, the Court of Appeals of New York states the law thus: 'It is not bound to take such cars if they are known to be defective and unsafe. Even if it is not bound to make tests to discover secret defects, and is not responsible for such defects, it is bound to inspect foreign cars just as it would inspect its own cars. It owes the duty of inspection as master, and is at least responsible for the consequences of such defects as would be disclosed or discovered by ordinary inspection. When cars come to it which have

defects visible or discoverable by ordinary inspection, it must either remedy such defects or refuse to take such cars; so much, at least, is due from it to its employés.'"

And, in addition to the main charge, the court gave appellant's requested charge No. 5 as follows:

"If you find that the car in question and the handhold thereon were inspected by defendant's inspectors at Del Rio and Sanderson as said car was being moved on its way to Uvalde where the accident to plaintiff happened, and that the inspection made thereof by said inspectors was such as it is usual and customary to make of such cars and handholds, and if you further find that no defect in said handhold was discovered on such inspections, and if you further find that the inspections that were made by defendant of said handhold after the car came onto the line of defendant, and before the accident to plaintiff happened, were such as persons of ordinary prudence engaged in the railway business would have had made thereof, and that the usual and customary method of defendant of inspecting such cars and handholds was such as persons of ordinary prudence, engaged in the railway business, would have adopted and used, then plaintiff is not entitled to recover, and you should return a verdict for the defendant."

[2] And the court also gave charge No. 4 at appellant's request, which reads:

"If you find that there was a defect in the handhold in question, but that same was latent (that is, that same was of a character that was not discoverable by such inspection as persons of ordinary prudence, engaged in the railway business, would have made of said handhold), then plaintiff is not entitled to recover, and you should return a verdict for the defendant."

These charges which were given covered practically all that was embraced in the other; and where a party asks more than one charge on the same subject, and the court selects and gives one of them, he cannot complain of the refusal of the others. Sullivan v. Fant, 160 S. W. 612; Railway v. Ford, 118 S. W. 1137; City of Greenville v. Branch, 152 S. W. 478. In Railway v. Haney, 94 S. W. 386, the court said:

"Where a party requests more than one special charge covering the same issue, and the court selects and gives the one more general in its terms, the party will not be heard to complain at the refusal to give the others, although the others are more specific in their nature."

There was no evidence to justify the charge which was refused, as complained of in the second assignment, because the appellant filed its pleading admitting that the nut was gone and that the bolt was rusty. That the nut may have been cracked and fitted loosely, and on that account may have come off, is a mere supposition. No witness says this is a fact. That the nut was gone is admitted, and the question the court was concerned with was whether appellant was negligent in failing to make a proper inspection so as to discover the missing nut.

But as before said, even if the charge had been applicable, the court gave one of the special charges on this subject, presenting the nonliability of the appellant; and, when this is done, it is not error to refuse other special charges on the same subject, as shown by the authorities cited above. The first three assignments are overruled.

[3] The uncontradicted evidence shows that appellee, as conductor of the train, had a right to board any part of the train, and whether it was to discover unauthorized persons riding in the emigrant car would be absolutely immaterial. The fourth and fifth assignments are overruled.

[4] The sixth to the eleventh assignments, both inclusive, are all directed against the admission of Dr. D. Berrey's testimony as to whether the other alleged injuries of the appellee, aside from the loss of his foot, could be caused by the traumatism or shock from the fall and injury to the limb mentioned. The statement under the first assignment, which is submitted as a proposition, contains about 19 pages of the brief. But we gather that the gist of the trouble lies in the following question by the appellee's attorney to Dr. Berrey:

"Q. Now, Doctor, answer the question, please, sir, and the question is this: State whether or not traumatism or shock can produce mastoid trouble?"

To which the witness replied:

"Yes, sir; it can."

The objection made was that the evidence it sought to elicit was too remote, and the opinion called for was speculative and conjectural, and that it was not based on a hypothetical question based upon the evidence in the case. Also that it sought the opinion of the witness as an expert upon the facts of the case as to whether this mastoid trouble was the result of the injury.

The plaintiff had testified that at the time of the injury he could not tell exactly what was the matter with him; that he had so much pain from his leg that he could not tell that anything else was the matter with him until later. In answer to the question, "Well, what other pains or injuries did you develop?" he answered:

"Well, sir, I had pains through my body and through my head. After a few months, I contracted trouble with my head, and it was very painful to me, and hurt me all the time, and I suffered a great deal with it—kind of roaring in my head and ear like—and I think it was in November of this same year, why I had a physician to come out to my house, and he pronounced it mastoid. I went over to the Physicians' and Surgeons' Hospital, and I was operated on for mastoid, and I suffered a great deal with that. After this accident, I didn't feel any trouble with my head for a while. I used to have a roaring sensation in there after I got up and began walking about the house. I never felt any inconvenience from it for a while, but when I got up and began walking around, taking exercise, why of course I could feel it."

Dr. Berrey had testified:

"I believe that anything that would have an effect to cause a run-down, depraved condition of the system generally might produce a condition of that sort, where the bone (mastoid bone), or any other part of the body (anything, as I say, that would produce a depraved, weakened, run-down condition of the system), might bring about a condition like that."

The substance of the hypothetical question propounded is:

"A man receives an injury February 5, 1913. He falls by reason of a handhold giving way with him, and his foot is crushed. He is taken to the hospital, and after a week his foot and leg are cut off. He states that at the time he was not conscious of much trouble, or any particular trouble, except the leg at the time, but after that, as soon as the acuteness of the pain in the leg wore away, why, he felt pains in his body, and particularly pains on this side of the head [indicating right side of the head], right back of the ear, where the operation was performed later on. Now, he goes along feeling those—that distress in his head, until he culminates, nine months after, this operation. Now, under those hypothetical facts, what connection could you make between the accident which caused the falling, or loss of the foot, and the mastoid operation?"

The witness answered as above, and later the court struck out the answer. Then the question first mentioned under this assignment was asked and answered as stated. It seems, from the objections made to the hypothetical question and answer given, that appellant objected for the reason that any testimony by the expert connecting or attempting to connect the accident and the condition of appellee would be "too remote, speculative, and conjectural, and entering the domain of possibilities." The witness was then asked:

"What do you think of the reasonable probability, under the facts that I have stated, of whether it did produce the trouble?

"In what way, in your judgment, Doctor, would there be any connection between the mastoid trouble, which developed, and the injured condition which was embraced in my hypothetical question?"

His answer, made after various objections, was:

"Well, in consequence of the loss of his leg, the man's habits of life were entirely changed. From an active man he became an invalid; he was confined to his house, became weak, exhausted, and run down; and in consequence of that weakness, exhausted, run-down condition, I believe that he could have developed inflammation in any part of the body—the mastoid or anywhere else—and you could attribute it entirely to the run-down condition of his system generally. Q. Following the injury? A. Following the injury."

On cross-examination by appellant's counsel the following:

"Q. Doctor, mastoid trouble is very rarely produced by direct injury, isn't it? A. Mastoid trouble, Judge, is produced by two causes: traumatism and disease; injury and disease."

Later the same question was asked, and the witness answered:

"Judge, I answered that. I will answer it again, certainly. I stated there that mastoid inflammation is produced by traumatism and disease. I can leave out disease, if you wish, and say—"

On objection this answer was struck out as not being responsive to the question. On direct examination Dr. Berrey had testified that traumatism or shock could produce mastoid trouble, and showed how it would or might result from the generally run-down condition and breaking down of the tissues,

resulting in pus formations in the mastoid bones, which are a honeycombed formation. When the tissues break down and form pus in these cells, it is very painful, and what is known as the mastoid operation is performed by making an incision over the mastoid bone, and chiseling down into the cells, so as to be able to drain them.

The substance, it seems, of the objections to this testimony is that the expert says traumatism or shock could produce the mastoid trouble, and does not show that it probably would do so; in short, that it is a mere possibility, not a probability. The witness does not use the word "probable" in connection with his testimony on this point, but he does say that mastoid trouble could result from shock or traumatism, and then proceeds in detail to show the connection between the traumatism or shock and the resultant effects as pertaining to mastoid trouble and how it occurs. We think that, on the whole, Dr. Berry's testimony shows that the mastoid trouble did probably result from the injury or traumatism at the time same occurred.

In Railway v. Grenig, 142 S. W. 139, Judge James, speaking for this court, said:

"The twelfth assignment is: 'The court erred in permitting Dr. B. F. Orr to answer the hypothetical question, in effect, whether or not the fall plaintiff claimed to have received, as described in the question, could have caused the condition in which he found A. Grenig in, and in permitting him to testify, in response to said question, in effect, that such an accident as described in said question could produce said condition, all of which more fully appears in defendant's bill of exception No. 2, which is referred to and made a part hereof.' The above assignment does not seek to bring into question the propriety of the hypothetical question, and the only question embodied in the propositions under it, which is germane to the assignment, is whether or not a physician can testify as an expert in answer to such a question that, from the facts stated in his opinion, the condition of the party could or would result from such facts. Such testimony was proper. Railway v. Burnett, 80 Tex. 538, 16 S. W. 320; Railway v. Williams, 26 Tex. Civ. App. 153, 62 S. W. 809; Railway v. Stoy, 44 Tex. Civ. App. 448, 99 S. W. 137."

We do not believe that "might" is any stronger term than "could," used in the sense in which that word is here employed.

And in Railway v. Abbott, 146 S. W. 1081, Judge James again says that a physician may testify that a certain kind of accident might cause serious injury to certain organs.

In Block v. Railway, 89 Wis. 371, 61 N. W. 1101, 27 L. R. A. 365, 46 Am. St. Rep. 849, the Supreme Court of Wisconsin said:

"It is also claimed as error that Dr. Becker was permitted to testify that plaintiff's condition, as he found it, could have been produced by contact with a wire heavily charged with electricity. The plaintiff's theory was that such was the cause of his condition. There was some testimony tending to establish that theory. Surely testimony showing that such a cause was sufficient to produce such a condition tended also to establish that theory. The testimony was both relevant and competent."

And in Taylor v. Railway, 256 Mo. 191, 165 S. W. 331, it was said:

"It is contended by appellant that the question would have been proper if the expert witness was asked, whether, in his opinion, the injury 'might or could' have produced paralysis, but that, by adding the word 'would' to the question, it became improper, and invaded the province of the jury. We are unable to agree with this contention. We see no material distinction between the meaning of 'would' and 'might or could,' as used in the question."

Again, in Seckinger v. Philibert, 129 Mo. 590, 31 S. W. 957, it is said:

"One who has practiced as a physician for 25 years is competent to testify as an expert that a blow could have caused pulmonary consumption, though he has already stated, while on the witness stand, that he was not a specialist in the treatment of consumption."

It seems that the real ground of objection was because the witness was dealing with possibilities and not probabilities, because appellant says, in presenting this matter to this court:

"As to the objections to Dr. Berrey's testimony: He testified that traumatism or shock can produce mastoid trouble; that anything that would produce a debilitated, run-down, exhausted state of the system would be productive (he thought) of abscesses or things of that kind through the body, and might produce a mastoid abscess; that in consequence of plaintiff's weakness, exhausted, and run-down condition, the witness believed that he could have developed inflammation in any part of the body—the mastoid or anywhere else—and you could attribute it entirely to the run-down condition of his system generally. The objections to this testimony were that the doctor was dealing with possibilities and not with probabilities; that is, that the testimony was speculative and conjectural."

But it will be recalled that the physician said:

"I do not agree with the statement that traumatism is rarely the direct cause of mastoid trouble. I think it is not so."

So it will be seen that the witness declined to assent to the proposition that traumatism rarely causes mastoid trouble. These assignments are overruled.

The twelfth, thirteenth, and fourteenth assignments complain of the refusal of certain requested special charges. That set forth in the twelfth is as follows:

"The court erred in refusing defendant's special charge No. 7, which (caption and signature omitted) reads: 'The evidence is not sufficient to justify a finding that the alleged urinary trouble of which plaintiff complains is due to injuries sustained by him in the said accident; and you are therefore instructed that you cannot in any event allow him anything on account thereof.' There is no evidence showing or tending to show that plaintiff's alleged urinary trouble is due to injuries sustained by him in the accident, and the court therefore erred in refusing to so instruct the jury."

The charges refused, of which complaint is made under these assignments, are substantially the same, except that one deals with urinary trouble, another with mastoid trouble, and the other with eye trouble. Therefore we deal with all together.

At appellant's request the court gave its special charge No. 10, as follows, formal parts omitted:

"The court having refused defendant's special charge No. 1 and having prepared and submitted to defendant's attorneys the main charge to the jury, and defendant comes and requires the following instruction: 'Gentlemen of the Jury: The evidence is not sufficient to justify a finding that plaintiff's alleged physical troubles, other than the injury to his leg, are permanent. You are therefore instructed that you cannot find that such other alleged physical troubles are permanent, and that you cannot in any event consider such injuries on the basis of their being permanent."

The main charge said nothing about the particular physical troubles dealt with in these requested special charges. Then appellant requested the court to charge the jury not to consider specific troubles complained of by appellee, because there was no evidence to sustain them, and at the same time asked the court to charge the jury, in effect, that such injuries might be considered as temporary, but must not be considered as permanent injuries. Appellant requested four special charges bearing on these matters, and the court selected one and gave it as above quoted. Railway v. Haney, 94 S. W. 386; Gosch v. Vrana, 167 S. W. 757; Webb v. Harding, 159 S. W. 1029; Railway v. Maples, 162 S. W. 426; Carter v. Lumber Yard, 160 S. W. 627; Beef Co. v. Yeargan, 123 S. W. 721; Poindexter v. Receivers, 101 Tex. 322, 107 S. W. 42; Sullivan v. Fant, 160 S. W. 612; Railway Co. v. Beckham, 152 S. W. 228; City of Greenville v. Branch, 152 S. W. 478.

But, aside from the matter as to whether appellant is estopped from complaint because of the fact that one of its special charges dealing with the subject was selected by the court and given, there was evidence on these other resultant injuries, and the court would have been justified in refusing them for that reason.

[5] There is no controversy that before the injury Harris was a strong, healthy man. He received this injury in which his foot was mangled, and he was dazed and shocked. For days he suffered intense pain. When it was seen that mortification would probably set up, the limb was amputated. From this time on he declined in health, and all his other ills developed, and he became a nerve-wrecked invalid. His habits of life were completely and radically changed. Even if it had not been in evidence from the physician, it occurs to us that it ought to be within the common knowledge of a layman that a run-down, weakened, nervous condition can readily produce just such ills as this unfortunate man suffered.

In Epstein v. Penn. Ry. Co., 143 Mo. App. 135, 122 S. W. 369, the Missouri court said:

"The testimony of plaintiff himself was that before this wreck he was a perfect man in all respects. His testimony tended to prove that after that he had become impotent. The fact of the accident was beyond question. He was injured in the wreck. There is no pretense of any intervening or intermediate fact to which

the change in his condition can be attributed. On these facts the jury had a right, as sensible men, as men of even ordinary intelligence, to form their own conclusions as to whether or not the alleged result was directly caused by the accident. Even assuming that the testimony of the physician in the face of his own declaration of nonexpertness on such matters is to be taken as the testimony of an expert that impotency does not follow such injuries as were testified to as having been received by plaintiff, and assuming, which was not true in this case, that witnesses of established reputation as experts on this branch of pathology had testified that impotency could not arise from or be directly caused by such injuries or from such an accident, we have in this case the express declaration of the court, given at the instance of defendant's counsel himself in his third instructions: 'You are instructed that the opinion of the physicians who have testified in this case are merely advisory, and not binding on you. You should accord to them such weight as you believe from all the facts and circumstances in evidence they are entitled to receive, and you are at liberty to disregard all or any part of their opinions which appear to you to be unreasonable.' So that, under this, the jury has the undoubted right to determine as between the testimony of plaintiff and the theoretical, somewhat mythical, testimony of experts."

The Supreme Court of Minnesota, in Rosted v. Railway, 76 Minn. 123, 78 N. W. 972, said:

"Appellant contends that there is no evidence to sustain the verdict, for the reason that it does not appear that the exposure caused the rheumatism. We are of the opinion that it is a matter of common knowledge that exposure to cold is likely to cause inflammatory rheumatism in a person who is susceptible to that disease, and therefore the evidence was sufficient to take the case to the jury, even though there was no expert evidence tending to prove that the exposure was the inducing cause of the rheumatism."

The Michigan Supreme Court (Proulx v. Bay City, 143 Mich. 550, 107 N. W. 274) said:

"In the present case, the plaintiff did suffer physical injuries. Her knee was bruised, slivers were run into her left hand, and she sustained a rupture of the navel. Some days after the accident, symptoms of numbness and paralysis in the left side and leg, pains in the back, difficulty and uncertainty of articulation, trouble with her vision, and with the bowels and kidneys, a relaxation of the muscles of the left side, and other symptoms made their appearance. We think it was so clearly a question of fact for the jury as to whether the physical injury was the direct cause of the paralysis and other symptoms as not to require discussion."

Even over in Massachusetts (Copson v. Railway, 171 Mass. 233, 50 N. E. 613) the court said:

"Plaintiff had enjoyed perfect health prior to an accident to a train on which he was a passenger, but shortly afterwards was found in a peculiar mental condition, with a wound on his hand and several bruises on his head. His physical system was deranged, and at the time of the trial his condition precluded him from testifying or leaving his house. Held to warrant a finding that his condition was the result of injuries received in such accident."

See, also, on this question, Railway Co. v. Bailey, 27 S. W. 302; Board of Councilmen v. Downey (Ky.) 118 S. W. 285; Howard

v. Terminal Ry. Ass'n, 110 Mo. App. 574, 85 S. W. 610; Chicago Traction Co. v. May, 221 Ill. 530, 77 N. E. 935; Harris v. Town of Mt. Vernon, 41 Wash. 444, 83 Pac. 1024.

These assignments are overruled.

[6] The fifteenth assignment will not be considered, because the same complains of the fourth paragraph of the court's charge, and the statement does not show that same was excepted to before the same was read to the jury. In fact, it does not appear that it was excepted to at all. Appellant did, however, request a special charge which was given by the court.

The sixteenth assignment is without merit and is overruled.

[7] The measure of damages set forth in the fourth paragraph of the court's charge is made the basis of complaint in the seventeenth assignment, because it did not say that same should be based on what sum paid now in cash would compensate plaintiff for his injuries. It seems that, when appellant examined the charge, the objection was made that it did not contain the "paid now" rule; and thereupon the court inserted "if paid now." Complaint is now made that it did not state, as requested, "if paid now in cash." There is only one legal interpretation to be given to the term "paid now," and that is paid in cash, unless for some special reason which would not apply to this case. The assignment is overruled; and the eighteenth, being without merit, is also overruled.

[8] The gist of the nineteenth assignment is that the requested special charge should have been given, because there was no evidence that plaintiff had earned any money aside from that made in his employment as conductor for appellant. If there was no evidence on that point, then there was no error in refusing to take from the jury an issue that was not before the jury for lack of evidence. Railway Co. v. Wininger, 159 S. W. 885; Railway Co. v. Sanchez, 57 Tex. Civ. App. 87, 122 S. W. 44; Railway v. Pool, 135 S. W. 644; Railway v. Archambault, 94 S. W. 1111; Railway v. Penny, 39 Tex. Civ. App. 358, 87 S. W. 720. Of course, if there was testimony, the charge should not have been given. The assignment is overruled.

The court did not err in refusing to give the charge made the basis of the twentieth assignment; and this assignment is overruled.

[9] The evidence in this case is such that the trial court felt called upon to and did charge the jury that appellee's injuries, other than the loss of the foot, were not permanent. This being true, we think the verdict is higher than we would be authorized to let stand.

Therefore, if appellee files in this cause a remittitur of $5,000 within 20 days, the judgment will be affirmed for the remainder of $20,000; otherwise the judgment will be reversed and the cause remanded.