EL PASO ELECTRIC RY. CO. v. ALLEN.
(No. 905.)

(Court of Civil Appeals of Texas. El Paso. Jan. 23, 1919. Rehearing Denied Feb. 20, 1919.)

1. STREET RAILROADS 117(31)—COLLISION WITH STREET CAR — CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

In action for personal injuries sustained by plaintiff, a child over 10 years old, struck by one of defendant's street cars while she was attempting to cross a street at a place other than a street intersection, question of contributory negligence *held*, under the evidence, for the jury.

2. STREET RAILROADS 98(6) — COLLISION WITH STREET CAR—CONTRIBUTORY NEGLIGENCE.

In the absence of a city ordinance requiring pedestrians to cross streets only at places indicated, it is not negligence per se to undertake to cross a street at other places than street intersections.

3. STREET RAILROADS 81(1) — USE OF STREETS—DUTY OF MOTORMAN.

It is the duty of those operating street cars to use ordinary care to avoid injuring persons using the streets.

4. STREET RAILROADS 117(13)—COLLISION WITH STREET CAR—NEGLIGENCE—QUESTION FOR JURY.

In action for injuries sustained by plaintiff, a child over 10 years old, struck by one of defendant's street cars while she was attempting to cross a street at a place other than a street

intersection, whether motorman failed to use ordinary care "to discover" and avoid injuring plaintiff, held, under the evidence, for the jury.

5. APPEAL AND ERROR ⊚⟾1062(1)—SUBMISSION OF ISSUES—HARMLESS ERROR.

Where the jury found that defendant was negligent in failing to discover child on street car tracks and in failing to signal, any error in form of question submitting issue of dangerous speed does not require reversal.

6. TRIAL ⊚⟾352(1)—SUBMISSION OF ISSUES—UNDUE PROMINENCE.

In suit by child for injuries from collision with street car, a question submitted, which grouped special issues of negligence, held not to render the verdict part general and part special, or place undue emphasis on any one or more of the issues assigned as negligence.

7. APPEAL AND ERROR ⊚⟾1072—ARGUMENT OF COUNSEL—REVERSIBLE ERROR.

In suit by a minor for injuries, it was not prejudicial error to refuse new trial, for remark of plaintiff's attorney in discussing the measure of damages, "The attorneys representing the plaintiff would get nothing except what the court allows them," was more the statement of the law than of a fact calculated to increase the verdict.

8. DAMAGES ⊚⟾132(9)—PERSONAL INJURIES—EXCESSIVE DAMAGES.

For injuries to plaintiff child over 10 years of age, necessitating amputation of her leg almost to the knee, a verdict of $15,000 is not so grossly excessive that court on appeal will interfere.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by Ruth Allen against the El Paso Electric Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Davis, Goggin & Harrington, of El Paso, and Baker, Botts, Parker & Garwood, of Houston, for appellant.

Lea, McGrady & Thomason, of El Paso, for appellee.

WALTHALL, J. On May 29, 1917, while attempting to cross the street car tracks on Boulevard street, between Dallas and Williams streets, in the city of El Paso, Ruth Allen, appellee, a girl 10 years and 5 months old, a normal child mentally and physically, was struck by one of appellant's street cars, knocked down, her right leg crushed, necessitating amputation at the knee. For the injury received she brings this suit.

Boulevard street, upon which the street car double tracks are situated, runs east and west, while Dallas and Williams streets run north and south, Dallas being west of Williams. The street cars go west on the north track and east on the south track. Ruth Allen lived on Dallas street south of Boulevard. Between 4 and 5 o'clock in the after-

noon on the date of the accident, Ruth was sent by her mother on an errand to a house on the north side of Boulevard street, and situated on Boulevard about midway between Dallas and Williams streets.

Just before the accident while on her way home, and while on the north side of Boulevard street, Ruth started to cross Boulevard street in the direction of her home, from a point on the north side of Boulevard about 100 feet east of the intersection of Dallas and Boulevard streets, but, seeing a street car approaching from the east on the north track (some witnesses said two cars were approaching from the east) she stepped back to the curb and waited for the car, or cars, from the east to pass. As soon as the car or cars going west had passed, she again started walking, from the same point, to cross the street to the said south side, passing behind the last west going car (if there were two) and was struck by an east-bound street car just as she got upon the south track.

The case was submitted upon special issues, the negligent acts charged being: (1) Negligence in operating the street car at a dangerously high rate of speed; (2) negligence in failing to give due signal of the approach of the street car; (3) negligence in failing to use due care to discover and avoid injury to persons using the street. The appellant pleaded general denial, and plea of contributory negligence of Ruth Allen in attempting to cross the street near the middle of the block, and passing behind one street car immediately in front of another. The trial resulted in a verdict and judgment in favor of plaintiff in the sum of $15,000, from which this appeal is prosecuted.

The court in its charge gave proper definitions of negligence and ordinary care, and instructed the jury that:

"It is the duty of a street railway company, such as defendant, in the operation of its cars along its track on the streets of a city, to use ordinary care to discover and to avoid injuring persons who are crossing such streets, and a failure of defendant's servants, agents, or employés operating its cars to use such ordinary care is negligence on the part of a street railway company."

The court, after instructing the jury as to the duty of a pedestrian in crossing a street along which a street railway operates its cars, submitted to the jury, among others, the following questions, to which the jury made the following answers:

Q. 1. "Do you find from a preponderance of the evidence that defendant's motorman was negligent on the occasion in question in operating the street car at the speed he was operating it as he approached the place where such car struck plaintiff, Ruth Allen?" Answer: "Yes."

Q. 3. "Do you believe from a preponderance of the evidence that defendant's employés operating the street car on the occasion in question

failed to use ordinary care to discover and avoid injuring Ruth Allen?" Answer: "Yes."

Q. 5. "Do you find from a preponderance of the evidence that defendant's employés failed to give due signal and warning of the approach of the street car at the place of the collision on the occasion in question?" Answer: "Yes."

Q. 6. "If you have answered, 'Yes,' to question No. 5, then answer 6: Do you believe from a preponderance of the evidence that such failure was negligence on the part of defendant's said employés, if they or either of them did so fail?" Answer: "Yes."

The court further charged as follows (to which we will refer as part of and embracing question 8):

"In questions No. 1, No. 3, and No. 6, are submitted to you certain alleged grounds of negligence. If you should have answered two or more of said enumerated questions in the affirmative, then and in that event answer this additional question: Question No. 8: Do you find from a preponderance of the evidence that a combination of two or more of the said negligent acts of which you have found the defendant guilty, if you have found the defendant guilty of any negligent act or acts, was the proximate cause of the injury to plaintiff, or a proximate cause thereof?" Answer: "Yes."

In question 9 the court submitted to the jury the issue of negligence of Ruth Allen in undertaking to cross the street at the place she did, from behind the west-going car as she did, and on the issues the jury found against appellant.

Appellant presents 11 assignments of error. The first assignment claims error in the court's refusal to give a submitted peremptory charge to find for appellant. It is the insistence of appellant under this assignment that the undisputed evidence shows that Ruth Allen undertook to cross the street and street car tracks near the center of the block instead of at a street intersection and regular crossing, passing behind a street car going west and immediately in front of the street car going east, which struck her. That her acts in so doing were negligent acts per se, and necessarily constitute the proximate cause of her injury. We need not state the evidence at length. It shows that Ruth Allen, after performing her errand on the north side of Boulevard street, started to return to her home on south side. She did not go to the intersection of Boulevard and Dallas streets, but undertook to cross at a point some 100 feet east of the intersection of those streets. She stepped off the sidewalk and saw a car coming from the east and stepped back. Another car had just preceded that one. That car had gone on west. The car approaching slowed down as if to let her on, but on her signal that she did not wish to take the car it went on slowly. She said:

"I looked for cars in the other direction. When that car passed I looked both ways, and I started again, and could not see any car coming. I went on across in behind the car I had let pass. I looked for cars in either direction. I was walking. I started straight across the track, and the car knocked me down. The car was going east. I did not hear that car or any gong or whistle on it. There was no alarm given there that the car was coming. I did not know the car was coming. The first I knew of it I heard the roaring of the wheels. I was so close to it then I could not get out of the way. If I had seen or heard that car coming I would not have gone on the track. I would have stayed on the curb until it passed. I suppose it was the front end of the car that struck me."

Witness Langston testified to seeing Ruth standing on the curb to let a car pass going west. He said:

"Two cars passed going west between the time the child stopped there (on the curb) and the time she got hit. The two cars were about 70 feet apart. * * * After the first car going west passed the child, she started to cross the street, and got 6 or 7 feet into the street before she stopped. She then turned and went back to the curb because the fellow sounded the gong and the kid shook her head no; that is, the motorman on the second car coming into town. * * * She shook her head, and came back to the curb. When the second car passed she started to cross the street. She was not running, but was going about like, well, about the average child of her age. I would consider she was walking. The car passed about its own length before she got off the curb and started across. The first time I saw the east-bound car coming on the south track, it was coming down hill. * * * It did not stop at Dallas street. I would say it did not give any alarm at Dallas street. It did not give any alarm, bell, or signal as it passed the west-bound car just before it struck this child."

Witness said the car was going about 25 or 30 miles an hour. The car hit the child twice, the first time a little north of the center of the car, knocking her 10 or 12 feet and down "on all fours," and as she raised, it struck her the second time.

Mrs. Staus, after testifying to the facts as to the child standing on the curb waiting for the west-going car to pass, said in part:

"When she saw that car coming into town, she got back and stood upon the curb. She waited for the west-bound car to pass, and then she started across from the curb in the direction of her home. She was walking. At the time the other car from town was coming, and she could not see it because it was behind the other car. The car going to town obstructed her view, and this car coming from town was going so much faster than the car going to town that the minute she went to cross it caught her before she got across. * * * She passed behind the car that was coming this way just a little bit; that car obstructed her view from the other car."

Other witnesses testified to practically the same circumstances. We have stated the evidence sufficiently, we think, to determine the question of negligence per se of appellee, presented in the assignment. Appellant refers

us to Freeman v. Garcia, 56 Tex. Civ. App. 638, 121 S. W. 886, and to St. Louis & S. W. Ry. Co. v. Shiflet, 37 Tex. Civ. App. 541, 84 S. W. 247, as sustaining its position. As we construe the cases, neither involves the question presented here. In the first case cited, Luz Garcia, 11 years of age, climbed upon the running board of the switch engine operating in the stockyards in the city of San Antonio. He slipped and fell therefrom and was injured. San Antonio had an ordinance making it unlawful for any person not a passenger to get on or cling to any street car or other railroad car in the city when in motion. Receiver Freeman pleaded the ordinance, and that Luz was on the engine in violation of the ordinance and without the knowledge of appellant or the employés. The point in that case having any similarity to the issue here was in the refusal of the court to give a peremptory instruction for appellant. In that case, Luz testified:

"Yes; me and the boys hop the train down there pretty often. I knew that if I fell off that car it would run over and hurt me, so when I got onto it I tried to hold on tight. Yes; when I went to jump I knew it was dangerous, and I was liable to get hurt. Yes; the police officers sometimes came down there, and got after us and chased us out in the brush."

Mr. Chief Justice James, in passing on the case, said there was nothing in evidence contradicting what Luz said, or that the employés had anything to do with causing Luz to jump off the engine while in motion. The court said Luz's own testimony shows beyond question that he knew that injury was likely to result to him if he attempted to get off the engine while in motion, or did not hold on tight, and therefore held on his evidence that he was guilty of contributory negligence.

Without stating or discussing the other case, we see no analogy between the issues there presented and the case at bar.

[1, 2] In presenting the question of contributory negligence on the part of Ruth Allen, in undertaking to cross Boulevard street, it is not suggested that her attempt to do so at a place other than the intersection of streets or at street crossings was in violation of any city ordinance. It has often been held that it is only where it is so clearly established from the undisputed evidence as to admit of no other reasonable hypothesis or conclusion that either a fact essential to plaintiff's cause of action has not been proven, or one which is a complete defense has been shown, that it becomes the duty of the court to instruct a verdict for the defendant. San Antonio Traction Co. v. Levyson, 52 Tex. Civ. App. 122, 113 S. W. 569, and cases there cited. In the absence of a city ordinance requiring pedestrians to cross streets only at places indicated in the ordinance, it would not be negligence per se to undertake to cross the street at other places than street intersections. San Antonio St. Ry. Co. v. Renken, 15 Tex.

Civ. App. 229, 38 S. W. 829. It is quite evident to us that the issue was one for the jury.

The second, fifth, and sixth assignments claim error: In the third paragraph of the charge in which the court tells the jury that it is the duty of a street railway company in operating its cars on the streets of cities to use ordinary care to discover persons who are crossing such streets; error in said subdivision of the charge because the undisputed evidence shows that there was no failure on the part of defendant's employés to use ordinary care to discover and avoid injuring Ruth Allen; and error in submitting the third question to the jury, whether defendant's employés used ordinary care to discover and avoid injuring Ruth Allen. The points of contention in these assignments seem to be that the use of the word "discover" in the charge in stating defendant's duty and in stating the third question to the jury places upon the defendant a burden more onerous than the law requires. The contentions are not sustained. One of the negligent acts assigned is:

"The motorman and conductor on said car failed to keep a good and reasonable lookout in approaching the place of injury to avoid running down persons using said street at said place, * * * in their failure to use due care to discover and avoid injuring persons in the use of said street."

[3] It certainly is the duty of those operating street cars in the streets of cities to use ordinary care to avoid injuring persons using the streets. How is that duty, at least in part, to be performed? As said in Railway v. Hewett, 67 Tex. 480, 3 S. W. 708, 60 Am. Rep. 32:

"It may be assumed, as matter of law, that it is the duty of a street railway company to know that the track in advance of its car is clear. * * * This involves the proposition that such railway company is bound to use such diligence as will enable it to know whether the track in front of its car is clear."

That knowledge is acquired and that diligence is exercised most frequently by keeping a lookout to see that the track is clear; that is, to discover persons obstructing the track upon which the car is being operated. The Supreme Court does not state a different rule in San Antonio Street Railway Co. v. Mechler, 87 Tex. 628, 30 S. W. 899, nor does Judge Fly in San Antonio Traction Co. v. Court, 31 Tex. Civ. App. 146, 71 S. W. 777, to which we are referred.

In T. & P. Ry. Co. v. Watkins et al., 88 Tex. 20, 29 S. W. 232, after discussing Railway v. Hewett, supra, the Supreme Court, through Judge Denman, says:

"The true rule is that it is the duty of the servants of the railroad company, operating its trains, to use reasonable care and caution to discover persons on its track, and a failure to

use such care and caution is negligence on the part of such company."

The ultimate point in the rule is, we think, for the person operating the car or engine to have a knowledge of conditions at the place where he is operating the car or engine, that he may by reason of such knowledge avoid injury. As seen from Railway v. Hewett, supra, and Railway v. Watkins, last above quoted, the Supreme Court uses different expression in stating the same duty. The motorman testified that he did not see Ruth until the moment his car struck her, and yet she was on or near the curb at the point from which she undertook to cross, while two cars passed her going west each going slow. She was standing, and her movements indicated that her intention was to cross the street at the place she then was. Some of the witnesses said she started to cross the street before each of the west-going cars, but each time returned to the curb. While some of the witnesses said she passed immediately behind the last west-going car, Mrs. Staus said:

"She stood on the curb and waited until the car got by. The car got well by her when she started across."

Mrs. Wilts, after detailing Ruth's movements for some moments before the accident, said:

"She stopped at or about the center line between our house and Mr. Langston's, and started to step down off the curb, and I think maybe she stopped after seeing the car coming and she stepped back up. It was the car coming to town. She stepped back up on the curb, and waited for that car to get by, and then there was a second car coming; there were two cars coming toward town; then she stood there on the curb until this second car got by, and then stepped down to walk across the street. She was still on the curb until the second car got by."

All of the witnesses for appellee were in position to see all cars, going each way, and hear when a gong was sounded. All of appellee's witnesses said the car that struck Ruth was going very fast. Witness Langston, a machinist, and ex-railroadman for 22 years, and had experience in estimating the speed of trains, said:

"The car before it struck the little girl was going about 30 miles an hour, but I am on oath, and I will say 25 miles an hour; I want to stay in the clear you know." He further said the first time he saw the east-bound car coming on the south track it was coming down hill in front of the Lamar School. "It did not stop at Dallas street. I would say that it did not give any alarm, bell or signal as it passed the westbound car just before it struck this child."

[4] The question complained of in the fifth and sixth assignments: Did the motorman fail to use ordinary care to discover and avoid injuring Ruth Allen? was one for the jury under the facts as we view them.

[5] One of the negligent acts assigned was that appellant was operating the car "at a dangerously high rate of speed," at the time of the accident. Assignments 3 and 4 complain of question 1, submitting that issue. Was the appellant negligent in operating the car at the speed he was operating it? The speed at which the car was moving at the time of the accident, as stated by the several witnesses, ranged from 8 to 30 miles per hour. The point made by the assignments is that it cannot be ascertained from the answer to the question submitted whether the jury found that the car was being operated at a dangerously high usual, or low rate of speed, and that therefore the finding that the speed at which the car was operated was negligent is without meaning. Probably two questions should have been submitted: Was the car operated at a dangerously high rate of speed, and if yes, was it negligence to so operate it? But the point of inquiry being negligence or no negligence in the operation of the car, under all the circumstances then surrounding the place, and the rate of speed at which it was operated being only secondary in point of importance in determining the issue of negligence, we think the form of the issue as submitted, while not to be commended, was at least intelligible. If no alarm was sounded at the crossing of Dallas street, and in passing the west-going cars, one car just west of Dallas street, and another approaching or at Dallas, it might be that a very low rate of speed would be exceedingly dangerous to a small child attempting to cross just east of Dallas street. There was no evidence offered as to what diligence, if any, was used by the motorman to discover Ruth while she was on the curb, or whether she could not have been seen from the car by the motorman before she left the curb to cross the street, or what diligence he used, if any, to see whether any person was in the act of crossing the street in that vicinity. The jury found that appellant was guilty of negligence in not discovering her. If she was on or near the curb at the time the west-going cars passed her, as several witnesses said she was, and her attitude and movements indicated that she was intending to cross the street then and at that point, it might be that her efforts to do so, and her position could have been seen by the motorman before she left the curb and passed behind the last west-going car, had he used ordinary care. The motorman said, only:

"I saw her just as the car struck her. She was almost in front of the car. I saw another car there at that time. The rear end of the car we were passing obstructed my view of her before she ran in front of my car. I had not seen her at all before she appeared in front of my car. When I first saw the child I was going from 12 to 14 miles an hour. The car coming into town and my car were almost even to each other at the time the child was struck. When I saw the child I applied the brakes."

The jury found that appellant was guilty of negligence in failing to use ordinary care to discover the child, and in failing to give due signal and warning of the approach of the car at the place of collision. Should it be error in the form in which question one submitted the issue of negligence in operating the car at a dangerously high rate of speed, as claimed in the third and fourth assignments, we think it would not be reversible error, since the jury found that appellant was guilty of negligence in the two instances stated.

[6] Error is claimed by the seventh and eighth assignments to the charge in submitting the eighth question. It is the contention under these two assignments that it is material error and a charge upon the weight of the evidence for the court when submitting a case upon special issues to group the issues and require a general finding on the issues grouped, as was done. We think to group the issues as in question 8 would not render the verdict part general and part special; nor does the charge place undue emphasis on any one or more of the issues assigned as negligent acts embraced in the group, but as we construe the charge it submits to the jury's finding, without submitting again a finding as to negligence, on any one of the issues, but whether any two or more of the issues submitted as separate acts or omissions assigned as negligence combined to proximately cause the accident resulting in the injury to the child. We think it was not amenable to the objection made. To operate a car at a dangerously high rate of speed might not, alone, cause an accident; but, if so operated without a careful lookout to see that the street is clear of those who might contemplate or be in the act of crossing, or, without giving an alarm, either act or omission, taken separately might be negligence, and yet the two acting together might also be the proximate cause or causes of the accident, linked together in a natural chain of causation, or sequence of events.

[7] By the ninth assignment complaint is made that appellee's attorney, in the closing argument to the jury, in discussing the measure of damages, said:

"The attorneys representing the plaintiff would get nothing except what the court allows them."

It is claimed the remark was highly prejudicial and calculated to and probably did increase the verdict, and was in violation of the rule that counsel shall be required to confine the argument strictly to the evidence and to the argument of opposing counsel. There was no evidence offered as to how attorneys were to be paid for services. If error, is the remark reversible error? The remark was not upon a fact calculated to increase the verdict. The remark was more the statement of the law which an intelligent jury would already know than a statement of a prejudicial fact. By the remark the jury

was advised virtually that the compensation to counsel would be under the supervision and order of the court, as in probate matters, the plaintiff being a minor, rather than paid under any contract between counsel and client. It does not even state to the jury that the compensation to be allowed by the court would be a part of the amount recovered. Certainly there is no appeal to the jury to increase the amount allowed in view of the compensation to be paid counsel. We think, possibly, it might have the opposite effect. A jury would know, without being told, that attorneys representing the child's claims would expect, in some way, to receive compensation. Would not the remark tend to allay any fear or supposition in the mind of the jury that the amount allowed by them might not be paid to the appellee in an unjust proportion? The matter is largely within the discretion of the trial court. It was not reversible error to refuse a new trial on account of the remark.

[8] By the tenth and eleventh assignments, it is insisted that the verdict is grossly excessive. The child's limb was crushed almost to the knee, necessitating an amputation at the kneejoint. The verdict allowed was $15,000. The surgeon who performed the operation at some length detailed the circumstances of the operation and his treatment of the child for a period of about six weeks thereafter. She continued to suffer after she came out from under the anesthetic. In order to amputate the limb at the kneejoint and save that much of the leg, the surgeon had to use some of the bruised skin, more or less infected from dirt rubbed in it, which meant more or less infection and suffering. After having become infected and inflamed, it was more or less painful every time dressed. The bones were splintered and broken clear into the kneejoint. The surgeon thought the child made a good recovery, and had no reason to believe she would suffer from nerve tumor, but had not seen the knee for a long time before testifying. Did not know if she has pain in the leg at all. Did not think she will suffer from pain in that leg. Thinks the most pain she will suffer will be soreness that will come at first from wearing an artificial leg, but that always wears away after you become used to the artificial leg. The child would always have the artificial limb gait, though not always noticeable. Should she succeed in getting an artificial limb that would work successfully, she would have to change them from time to time as she grows taller. As to whether the child will suffer depends upon how good a job has been done in taking off the leg. They will suffer usually more from a little tumor that forms in the end of the nerve—that nerve endeavors to go out and establish communication with something. It is a nerve there with a function. Then testified what was done to prevent the pain. Mrs. Allen, the child's mother, testified

that Ruth still suffered from the loss of the limb, and would often cry out in her sleep because of it; that on one part of the end of the stub the skin and flesh had not cushioned, so that it was a thin, bare tender skin only, protecting the end of the bone, thus necessitating further operation before she can wear an artificial limb.

There is no fixed rule as to the amount of the damages. The jury thought that the amount allowed would not be excessive. Judge McMeans, in Railway v. Brouillette, 61 Tex. Civ. App. 619, 130 S. W. 886, in which a writ of error was denied, and in which the jury had assessed the damages to a boy 2 years and 7 months old at $30,000 for the loss of his leg below the knee, reduced the amount to $20,000. Judge Neill, in Railway v. McLeod, 62 Tex. Civ. App. 270, 131 S. W. 311, held that a judgment for $15,000 for injury to a boy 14 years old in the loss of a foot was not excessive. In Railway v. Harris, 172 S. W. 1129, a verdict for $20,000 for loss of a foot was held by Judge Carl not to be excessive. In Railway v. Green, 182 S. W. 392, a verdict for $18,000 for loss of a leg was held not to be excessive. Ruth is shown to be a child of average intelligence. There was no evidence of earning capacity. We construe the opinion of the Supreme Court in Gainesville, H. & W. Ry. Co. v. Lacy, 86 Tex. 244, 24 S. W. 269, as holding that a jury can take into consideration what would have been the earning capacity of Ruth Allen after arriving at her majority without pleading or evidence. To the same effect is Railway v. Jackson, 38 Tex. Civ. App. 201, 85 S. W. 445, and the cases cited.

Finding no reversible error, the case is affirmed.